**UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION – FLINT**

| | |
|---|---|
| In re: | Chapter 11 |
| TELESCOPE PROPERTIES, LLC, | Case No. 24-30425-jda |
| Debtor. | Hon. Joel D. Applebaum |

_______________________________/

# DEBTOR'S MOTION TO (I) APPROVE SALE OF 16708 CHAPLIN AVENUE, ENCINO, CALIFORNIA, FREE AND CLEAR OF LIENS; (II) AUTHORIZE PAYMENT AT CLOSING OF BROKER COMPENSATION, CUSTOMARY CLOSING COSTS, AND THE FIRST MORTGAGE CLAIM, AND DEPOSIT OF ESTIMATED UNITED STATES TRUSTEE FEES WITH THE OFFICE OF THE UNITED STATES TRUSTEE; (III) REQUIRE ALL REMAINING SALE PROCEEDS TO BE HELD BY THE TITLE/ESCROW COMPANY PENDING FURTHER COURT ORDER; (IV) PRESERVE THE DEBTOR'S REQUEST TO SURCHARGE SECURED RECOVERIES UNDER 11 U.S.C. § 506(c), INCLUDING FOR UNITED STATES TRUSTEE FEES AND PLAN/SALE-RELATED FEES; AND (V) WAIVE THE STAY UNDER FED. R. BANKR. P. 6004(h)

Telescope Properties, LLC (the "Debtor") moves for an order: (a) approving the sale of the real property commonly known as 16708 Chaplin Avenue, Encino, California 91436 (the "Chaplin Property") for $2,100,000 to Miriam Kavalerchik and Kara Goldsmith (together, the "Buyers") under a written agreement on terms no less favorable to the Debtor than the Buyers' August 22, 2026 offer, providing for closing on

or before October 15, 2026 free of any loan or appraisal contingency (the "Sale"); (b) authorizing the Sale free and clear of liens and interests, with unpaid liens attaching to the proceeds; (c) authorizing payment at closing of broker compensation, itemized ordinary sale and closing costs, and the first-mortgage payoff to NWL Company, LLC ("NWL") in full in the amount of its then-current written payoff demand, subject to the Debtor's agreement, and directing the deposit at closing of the estimated United States Trustee fees with the Office of the United States Trustee; (d) directing the title/escrow company handling the closing (the "Title Company") to hold all remaining proceeds pending further order; (e) preserving for later determination the Debtor's request to surcharge the junior secured recoveries under 11 U.S.C. § 506(c), including for United States Trustee fees and plan-related fees; and (f) waiving the fourteen-day stay under Fed. R. Bankr. P. 6004(h). If the Debtor and NWL cannot agree on the amount owed to NWL, the sums otherwise payable to NWL shall also be escrowed with the Title Company pending further order.  The Debtor states:

## I. JURISDICTION AND PROCEDURAL BACKGROUND

1. This Court has jurisdiction under 28 U.S.C. §§ 157 and 1334 and, under Article VII of the Plan and paragraphs 8 and 9 of

the Confirmation Order (each defined below), retained jurisdiction to implement and enforce the confirmed Plan. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (K), (N), and (O). To the extent any part of this Motion is determined not to be core, the Debtor consents to entry of a final order by this Court. Venue is proper under 28 U.S.C. §§ 1408 and 1409.

2. The Debtor filed its voluntary Chapter 11 petition on March 6, 2024 and operated as a debtor in possession under 11 U.S.C. §§ 1107 and 1108 until confirmation. No trustee or official committee was appointed.

3. On July 13, 2026, the Court entered the Stipulated Order Confirming Debtor's Second Amended Combined Plan and Disclosure Statement and Granting Final Approval of Disclosure Statement (the "Confirmation Order"). The confirmed Second Amended Combined Plan and Disclosure Statement (the "Plan") is at ECF No. 191. The Confirmation Order governs the disposition of the Chaplin Property, which it identifies as 16708 Chaplin Ave., Los Angeles, California 91436 (Encino is a community within the City of Los Angeles).

4. Under 11 U.S.C. § 1141(b), confirmation vests the property of the estate in the debtor except as the plan or the confirmation order provides otherwise, and Plan § 8.1 provides that all assets of the Debtor revest in the Debtor upon confirmation. Paragraph 7 of the Confirmation Order likewise refers to property that vested in the Debtor under § 1141. The Plan and the Confirmation Order nonetheless keep the Chaplin Property under this Court's supervision until it is sold. Plan § 4.1 identifies a sale of the Chaplin Property under 11 U.S.C. § 363 as one of the Plan's two primary sources of funding. The Confirmation Order keeps the automatic stay in effect as to the Chaplin Property until October 15, 2026 (¶ 3.A(viii)); requires that any sale free and clear of liens proceed by noticed motion and further order, and preserves NWL's right to credit bid to the extent the Bankruptcy Code permits (¶ 3.A(vi)); preserves all liens, claims, interests, and rights of parties in interest until they are treated, paid, released, or otherwise resolved under the Plan, the Confirmation Order, or further order (¶ 4); and retains jurisdiction over all matters necessary to implement

and enforce the Plan and the Confirmation Order, including the treatment of claims (¶¶ 8 and 9; Plan art. VII).

5. The Debtor brings this Motion under those provisions; under 11 U.S.C. § 1142(b), which authorizes the Court to direct the Debtor and any other necessary party to perform acts necessary to consummate the Plan; and under 11 U.S.C. § 363(b) and (f), as the Plan and the Confirmation Order contemplate.

6. The Confirmation Order provides that NWL, as successor in interest to Wilmington Savings Fund Society, FSB, not in its individual capacity but solely as Owner Trustee for the FLIC Residential Mortgage Loan Trust 1, and/or its assigns, holds a fully secured claim against the Chaplin Property. The order fixed the amount due as $1,653,565.79 as of May 29, 2026, subject to later contractual accruals and an updated payoff demand.

7. The Confirmation Order requires the Debtor to pay NWL in full through escrow in connection with a sale no later than October 15, 2026 (the "Sale Deadline"). If NWL is not paid in full by then, the automatic stay and plan restrictions protecting the Chaplin Property terminate without further order, permitting NWL

to exercise its foreclosure remedies. Debtor's counsel has requested a payoff from counsel for NWL.

8. Paragraph 3.A(v) of the Confirmation Order provides that any sale shall pay through escrow NWL's Secured Claim (as the Confirmation Order defines it), all other valid liens entitled to payment from the sale proceeds, and customary and necessary closing costs and prorations. Plan § 4.1(A) likewise contemplates that lienholders of record are paid from the proceeds at closing on the final closing statement and payoff statements, with net proceeds going to the Debtor's debtor-in-possession account. The current amounts of the liens asserted by Allstate Lending Group, Inc. and/or its servicing affiliate ("Allstate") and by Othon Trinidad ("Trinidad") have not been established, Allstate's only written payoff dates from 2023, and Allstate is itself a Chapter 11 debtor. The Debtor therefore proposes to carry out paragraph 3.A(v) as to those liens through the escrow procedure described below: the proceeds are held in escrow and paid to each junior lienholder once the validity, amount, and priority of its lien and the surcharge request

have been agreed to,  or determined by the Court, and any balance is then released to the Debtor for use as the Plan provides.

## II. MARKETING HISTORY AND CURRENT $2.1 MILLION OFFER

9. By application filed April 23, 2025 [ECF No. 121], the Debtor sought authority to employ Sandlot Homes and Amanda Lockwood (together, the "Broker") as real estate broker for the Chaplin Property. The Court approved the employment [ECF No. 131]. The property has been marketed through the Multiple Listing Service and customary channels since May 2025.

10. The Debtor completed substantial rehabilitation and cosmetic work and kept the property professionally staged and available for showings. The marketing period has been lengthy and has included repeated open houses, showings, price adjustments, and negotiations with prospective purchasers.

11. The marketing history shows why the present opportunity should not be lost. A $2,000,000 offer received in January 2026 did not proceed after the Debtor tried unsuccessfully to obtain a higher price. The Debtor lowered the list price to $2,147,500 in March 2026. An April 22, 2026 written offer for

$2,127,000 was withdrawn after inspection. A later verbal offer of $1,950,000 did not proceed after the Debtor countered at $2,100,000, the price now offered in writing. Although one prior written offer reflected in the Debtor's status reports exceeded $2 million, no offer above $2 million has proceeded to closing.

12. On January 27, 2026, the Debtor filed a motion to sell the Chaplin Property free and clear of liens at a stated minimum price of $2,194,000, based on the marketing conditions and offers then pending. The Debtor withdrew that motion without prejudice. The Debtor renews its request for sale authority based on the current $2,100,000 offer and the marketing history described in this Motion.

13. On August 22, 2026, the Buyers signed a California Residential Purchase Agreement offering $2,100,000 for the Chaplin Property (the "Purchase Offer"). The Purchase Offer provides for an initial deposit of $63,000, a $1,470,000 first loan, and closing thirty days after acceptance. It is contingent on the Buyers' loan and on appraisal. The $2,100,000 price is above the $2,050,000 Plan floor target price (the Plan's "Minimum Price").

## III. LIENS, PAYOFFS, AND PROPOSED USE OF SALE PROCEEDS

14. The Debtor understands that the Chaplin Property is subject to the following asserted secured interests, subject to updated payoff demands, proof of lien, and the rights of all parties: (a) NWL, first priority; (b) Allstate, second priority; and (c) Trinidad, who asserts a third-priority construction-related mechanic's lien or secured claim.

15. NWL. The Confirmation Order states that NWL was owed $1,653,565.79 as of May 29, 2026, with postpetition interest, default interest, fees, costs, advances, and other contractual amounts continuing to accrue. The Debtor therefore requests authority to pay NWL in full at closing the amount shown on its current written payoff demand, which the Debtor contemplates that it will obtain before closing as paragraph 3.A(iv) of the Confirmation Order requires. If the parties cannot agree on what that amount is, Debtor proposes the amounts otherwise payable to NWL be escrowed as well.

16. Allstate. Allstate's November 3, 2023 payoff demand states a total payoff of $135,705.59, is expressly good through November 30, 2023, and states per diem interest of $29.3626 thereafter. Applying that per diem without compounding, and without adding later fees, advances, charges, or credits, produces an estimate of $166,536.32 as of the October 15, 2026 Sale Deadline ($135,705.59 + 1,050 days × $29.3626). Because the payoff is dated 2023 and Allstate's September 11, 2026 maturity notice does not state a current payoff, that figure is an estimate only. The Debtor has requested a current written payoff from Allstate.

17. Allstate has advised the Debtor, by a September 11, 2026 letter from its Chief Restructuring Officer, Howard Grobstein, that Allstate Lending Group, Inc. filed its own Chapter 11 petition earlier in 2026 and that, based on Allstate's initial file review, the Chaplin loan appears matured and delinquent. The letter states that if the Debtor does not respond by September 30, 2026, and the loan remains delinquent, Allstate will begin taking steps to enforce the debt, including recording a notice of default. The Debtor is communicating directly with Allstate's Chief Restructuring Officer

about the Chaplin loan. This Motion does not pay or reduce Allstate's lien. It transfers the lien to the retained proceeds with its existing validity, extent, and priority. Because Allstate is a Chapter 11 debtor, the Debtor is serving this Motion on Allstate through its Chief Restructuring Officer and on counsel of record in Allstate's case.

18. Trinidad and staging/preservation costs. Debtor estimates at least $250,000 for the third-position payoff asserted by Trinidad, and the Plan describes his claim as approximately $254,790 arising from mechanic's lien rights. Neither figure is established by this Motion. Debtor estimates $18,800 for staging, property maintenance, and security. That $18,800 item is listed apart from Trinidad's asserted claim and is not a customary closing cost. Upon information and belief, Vesta Home Staging ("Vesta") does not hold or assert a lien against the Chaplin Property. The Debtor's May 21, 2026 status report states that Trinidad initially paid part of the staging cost, subject to reimbursement upon sale. Before seeking any surcharge for the staging item, the Debtor will reconcile Vesta's charges, any payments by Trinidad, and any

reimbursement component within Trinidad's asserted claim, so that no expense is counted twice. The $18,800 will remain in the retained proceeds at closing and is included in the Debtor's § 506(c) surcharge request for later determination. None of it will be paid at closing.

19. Debtor assumes a $2,100,000 sale price and $184,310 in selling and closing costs. The $184,310 figure does not include the $18,800 staging item. It does include a 6% broker commission ($126,000) and a $42,000 allowance for "closing fees." The Title Company will itemize the closing-fee allowance and reconcile it against the other listed charges, the compensation provided in the Broker's employment order, and the 2.5% compensation to the Buyers' broker stated in the Purchase Offer. Closing disbursements will be limited to court-approved broker compensation and ordinary, necessary, and customary sale and closing costs, including taxes, prorations, transfer charges, title charges, recording charges, and escrow charges, in each case as actually incurred and itemized, together with NWL's payoff and the deposit of estimated United States Trustee fees described in paragraph 35.

20. The amount available for junior interests cannot be fixed until NWL supplies its current payoff and the title company prepares a final settlement statement. For illustration only, using the pro forma's $184,310 in selling and closing costs and the Confirmation Order's May 29, 2026 NWL amount of $1,653,565.79 as a floor, approximately $262,124.21 of the $2,100,000 price would remain after those payments. After the estimated $19,875 United States Trustee deposit ($18,900 generated by the Sale plus $975 now outstanding), approximately $242,249.21 would remain. After Allstate's per-diem-only estimate of $166,536.32 as of October 15, 2026, approximately $75,712.89 would remain, before additional NWL accruals and other closing adjustments. That amount is less than the approximately $250,000 to $254,790 that the Debtor and the Plan, respectively, attribute to Trinidad. The actual retained amount will be shown on the final settlement statement.

## IV. UNITED STATES TRUSTEE FEES, STAGING COSTS, AND COUNSEL FEES

21. Quarterly United States Trustee fees under 28 U.S.C. § 1930(a)(6) are calculated on total disbursements in each calendar quarter and are payable until the case is closed, converted, or

dismissed. For quarters beginning on or after April 1, 2026, and through December 31, 2030, the fee for a quarter with disbursements of $1,000,000 or more is 0.9% of disbursements, not to exceed $250,000. 28 U.S.C. § 1930(a)(6)(B)(ii)(II).

22. The Sale is expected to close in the fourth calendar quarter of 2026. If the closing produces $2,100,000 in reportable disbursements in that quarter, the sale-generated fee would be $18,900. The actual fee will depend on all disbursements in the quarter, including how the proceeds retained in escrow are treated for reporting purposes, and may be lower if the retained proceeds are not disbursed in that quarter. Any further fee attributable to a later disbursement of retained proceeds will be added to the surcharge request when it is incurred.

23. In addition, $975 in United States Trustee fees for earlier quarters is presently outstanding. Paragraphs 5 and 6 of the Confirmation Order and Plan § 9.1 require the Debtor to pay quarterly fees until the case is closed, and nonpayment would itself be cause for conversion or dismissal, which would end the sale process. The Debtor includes the $975, together with the

sale-generated fee, in its surcharge request and asks that the estimated total of $19,875 be deposited with the Office of the United States Trustee at closing as described in paragraph 35. The fee for the third quarter of 2026 is due by October 31, 2026 based on that quarter's disbursements.

24. Debtor's counsel filed a First and Final Fee Application (the "Fee Application") requesting $28,770 for services through July 13, 2026, the date of confirmation. The Fee Application includes various time entries that specifically concern the Chaplin Property sale process. Debtor requests that these amounts, to the extent allowed, be included in its surcharge request. Any amount recovered by surcharge will be credited against the amount allowed on the Fee Application so that no fee is paid twice. The Fee Application also includes Plan and Disclosure Statement services. The Plan is a single combined plan, and one of its two principal funding sources is the sale of the Chaplin Property (Plan § 4.1). The Plan and the Confirmation Order established the Chaplin sale framework and the October 15, 2026 sale window that made the present sale possible in place of an immediate foreclosure.

25. The Debtor also includes in its surcharge request the $18,800 staging and property-preservation item reflected in the pro forma. Professional staging and preservation were used to market the Chaplin Property over an extended period and helped produce the present sale. Vesta does not hold a lien, and the Debtor does not ask that Vesta be paid at closing. The $18,800 will remain in escrow with the other retained proceeds and may be paid only if and to the extent the Court later authorizes it. The later motion will attach the invoices, dates of service, and records of amounts paid by Trinidad or others, and will identify the proper payee.

26. Post-confirmation legal services to review and document the Sale, analyze payoffs and lien treatment, prepare and prosecute this Motion and the related ex parte motion, communicate with the Buyers, the Broker, the secured creditors, and title company, prepare for hearing, and coordinate closing were not included in the Fee Application. Article VII(G) of the Plan retains the Court's jurisdiction to review professional fees for post-confirmation services in connection with the Plan. The Debtor requests that those

Chaplin sale and closing fees, in the amount later allowed by the Court, also be included in the surcharge.

## V. RELIEF REQUESTED AND LEGAL BASIS

### A. The Sale Is Supported by a Sound Business Purpose.

27. Section 363(b)(1) permits a sale of estate property outside the ordinary course of business after notice and a hearing, and the Plan calls for a § 363 sale of the Chaplin Property (Plan § 4.1(A)). The Sixth Circuit requires an articulated, sound business purpose for such a sale. Stephens Indus., Inc. v. McClung, 789 F.2d 386, 390 (6th Cir. 1986). The Debtor makes the same showing in support of the relief it seeks under the Confirmation Order and 11 U.S.C. § 1142(b).

28. The Sale meets that standard. The property has been exposed to the market for more than a year through a court-approved broker; prior offers have failed; the current $2.1 million offer is within the range produced by the market after extensive marketing and is above the $2,050,000 floor set in the Plan; carrying costs continue; and the Confirmation Order imposes an October 15, 2026 deadline after which NWL may foreclose. A prompt sale preserves value and carries out the confirmed Plan.

**B. The Sale Should Be Approved Free and Clear of Liens.**

29. Section 363(f) permits a sale free and clear of an interest if any one of its five alternatives is satisfied. As to any lienholder that affirmatively consents, § 363(f)(2) applies.

30. As to any junior lienholder that does not consent, the Debtor relies on § 363(f)(5), which permits a sale free and clear if the interest holder "could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest." The Chaplin Property is in California. If NWL is not paid by the Sale Deadline, the Confirmation Order permits NWL to foreclose, and NWL may do so by trustee's sale under its deed of trust. After a trustee's sale, California law applies the proceeds first to the costs of sale and the obligation secured by the foreclosing deed of trust, and then "to satisfy the outstanding balance of obligations secured by any junior liens or encumbrances in the order of their priority." Cal. Civ. Code § 2924k(a)(3). In that proceeding a junior lienholder is limited to a money satisfaction from the sale proceeds. The liens asserted by Allstate and Trinidad are junior monetary encumbrances of that kind. See In re Signature Developments, Inc., 348 B.R. 758 (Bankr. E.D. Mich. 2006) (applying § 363(f)(5) where

applicable law permits a money remedy in place of equitable enforcement, and transferring the interest to the sale proceeds). The proposed order produces the same result: each junior lien attaches to the retained proceeds with the validity, extent, and priority it had before the sale.

31. NWL will be paid in full as the Confirmation Order requires, and any junior lien not paid at closing will attach to the retained proceeds with the same validity, priority, and extent, subject to the surcharge request, objections, defenses, and further orders of the Court.

**C. The Surcharge Request, Including United States Trustee Fees and Plan-Related Fees, Should Be Preserved.**

32. Section 506(c) permits the trustee to recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving or disposing of that property, to the extent of any benefit to the holder of the claim. A debtor in possession may invoke the section under 11 U.S.C. § 1107(a). Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A., 530 U.S. 1, 6 & n.3 (2000). The Debtor held that right before confirmation. Paragraph 4 of the Confirmation Order preserves the

rights of parties in interest until they are resolved under the Plan, the Confirmation Order, or further order. Article VII(B) of the Plan retains this Court's jurisdiction over claims "initiated under §§ 506 and 510" of the Code, and paragraphs 8 and 9 of the Confirmation Order retain jurisdiction over the treatment of claims and the implementation of the Plan.

33. The Sixth Circuit requires the party seeking a surcharge to prove that the expenses were reasonable, necessary, and beneficial to the secured party; alternatively, recovery may be based on the secured party's direct or implied consent or causation of the expense. In re Ferncrest Court Partners, Ltd., 66 F.3d 778, 782 (6th Cir. 1995). Section 506(c) is an exception to the general rule that administrative expenses may not be charged against secured collateral and prevents a secured creditor from receiving a windfall from preservation or disposition efforts paid for by others. In re Foremost Mfg. Co., 137 F.3d 919, 923 (6th Cir. 1998).

34. Debtor asks that the request be preserved, that the retained proceeds remain in escrow, and that the Court determine the surcharge on a later motion.

35. The Debtor includes all United States Trustee fees attributable to the Sale in its surcharge request as a § 506(c) line item: the quarterly fee generated by the closing disbursements, the $975 in earlier-quarter fees now outstanding, and any further quarterly fee generated by a later disbursement of the retained proceeds. Paragraphs 5 and 6 of the Confirmation Order and Plan § 9.1 require the Debtor to pay quarterly fees until the case is closed, and failure to pay them is cause for conversion or dismissal under 11 U.S.C. § 1112(b)(4)(K). Paragraph 7 of the Confirmation Order addresses post-confirmation conversion. Conversion or dismissal before closing would end the sale process established by the Confirmation Order, and the junior lienholders would then face the foreclosure described in paragraph 30, in which their recovery would be limited to any surplus after NWL's trustee's sale. The Debtor contends that the fees are therefore reasonable and necessary costs of preserving and disposing of the Chaplin Property that benefit the junior lienholders, and it will present that showing with the later surcharge motion. So that the fees are available when due without delaying the closing or the case, the Debtor asks that

the Title Company remit the estimated fees at closing to the Office of the United States Trustee, to be held on deposit and applied to the Debtor's quarterly fees when due. The estimate is $19,875 ($18,900 for the closing disbursements and $975 outstanding), adjusted to the amount that the Office of the United States Trustee confirms is due. The deposit is a holding mechanism only. It does not decide whether the fees may be charged against the junior lienholders' recoveries, which the Court will determine on the surcharge motion, and the Court may direct any adjustment or restoration to the retained proceeds that its ruling requires. The Debtor will confer with the Office of the United States Trustee about the mechanics of the deposit before the hearing. If the Office does not accept the deposit, the estimated amount will be held in the segregated escrow with the other retained proceeds until the fees are due.

**D. Closing Disbursements and Retention of Remaining Proceeds in Escrow.**

36. To permit a prompt, orderly closing while preserving all disputes concerning the junior liens and the surcharge request, the Debtor requests that the Title Company be authorized to disburse

from the gross sale proceeds only: (a) court-approved broker compensation and itemized, ordinary, necessary, and customary sale and closing costs, including taxes, prorations, recording charges, title charges, and escrow charges, but excluding the $18,800 staging and property-preservation item; (b) NWL's then-current payoff in full, as required by the Confirmation Order so long as Debtor and NWL agree on that amount; and (c) the estimated United States Trustee fees, which the Title Company will remit at closing to the Office of the United States Trustee, to be held on deposit as described in paragraph 35.

37. After the payments and the deposit authorized under paragraph 36 are made, the Title Company will retain all remaining net sale proceeds, together with any interest earned on them, in a segregated escrow account subject to the liens, claims, priorities, surcharge request, objections, defenses, and rights of all parties until further order of this Court. No retained proceeds will be distributed to Allstate, Trinidad, Vesta, Debtor's counsel, the Debtor, or any other person or entity without further order. No specific reserve within the escrowed funds is requested for Debtor's

counsel; the amount, if any, ultimately payable for allowed counsel fees, plan-related fees, staging and preservation expenses, or other surcharge items will be fixed by later order.

### E. Good-Faith Purchaser Protection and Waiver of Rule 6004(h).

38. The Debtor understands the Purchase Offer to be the product of the Broker's marketing and arm's-length negotiation. The Debtor requests a finding under 11 U.S.C. § 363(m) that the Buyers are good-faith purchasers and that the sale price was not controlled by an agreement among potential bidders prohibited by 11 U.S.C. § 363(n).

39. Cause exists to waive the fourteen-day stay under Fed. R. Bankr. P. 6004(h). The Sale Deadline is October 15, 2026; the property has already been marketed for an extended period; prior transactions have failed; the current opportunity requires prompt certainty; and delay risks foreclosure and loss of value to the junior secured creditors and the Debtor.

## VI. NOTICE

40. The Debtor will serve this Motion and the Notice of Motion and Opportunity to Object as required by Fed. R. Bankr. P. 2002(a)(2), 6004(c), 7004, and 9014 and E.D. Mich. L.B.R. 6004-1(b)

and 9014-1, on all creditors and parties in interest and on all parties asserting an interest in the Chaplin Property. Debtor will also serve any counsel of record for Allstate in Allstate's Chapter 11 case whom it identifies by email. In addition to CM/ECF and first-class mail service, the Debtor will e-mail Richard LaCivita, counsel for NWL, at Richard.LaCivita@sottileandbarile.com; Allstate's Chief Restructuring Officer at cro_allstate@gtllp.com; and Trinidad at othontrinidad70@yahoo.com. The Debtor is filing with this Motion an ex parte motion under Fed. R. Bankr. P. 9006(c)(1) and E.D. Mich. L.B.R. 9006-1(b) to shorten the notice and response periods. The Debtor requests that the order on that motion fix September 29, 2026 at 2:00 p.m. Eastern Time as the response deadline and set the hearing for September 30, 2026 at 11:00 a.m. Eastern Time.

## VII. CONCURRENCE

41. Pursuant to E.D. Mich. L.B.R. 9014-1(h), Debtor's counsel requested concurrence in the relief sought in this Motion by e-mail on September 18 and 20, 2026 from Richard LaCivita, counsel for NWL, at Richard.LaCivita@sottileandbarile.com; Allstate's Chief Restructuring Officer at cro_allstate@gtllp.com;

Trinidad at othontrinidad70@yahoo.com; and the Office of the United States Trustee. Any responses received before the hearing will be reported to the Court.

**WHEREFORE**

The Debtor requests entry of an order substantially in the form attached as Exhibit 1: (a) approving the $2,100,000 Sale to the Buyers under the Sale Agreement; (b) authorizing the Sale free and clear of liens and interests, with unpaid junior interests attaching to the retained sale proceeds; (c) authorizing payment at closing only of court-approved broker compensation, itemized ordinary and customary sale and closing costs excluding the $18,800 staging and property-preservation item, and NWL's then-current payoff in full; (d) authorizing the Title Company to remit the estimated United States Trustee fees to the Office of the United States Trustee at closing, to be held on deposit and applied to quarterly fees when due, without determining whether they may be charged against the junior lienholders' recoveries; (e) directing the Title Company to retain all remaining sale proceeds in escrow pending further order; (f) preserving for later determination the Debtor's request to surcharge the junior secured recoveries for the $18,800 in staging and property-preservation

expenses, relevant pre-confirmation Debtor's counsel fees, including the Plan and Sale -related fees described in the Motion, post-confirmation Chaplin sale and closing fees later allowed by the Court, and United States Trustee fees; (g) preserving the claims and priorities of Allstate and Trinidad in the retained proceeds; (h) finding that the Buyers are good-faith purchasers entitled to the protections of 11 U.S.C. § 363(m); (i) waiving the fourteen-day stay under Fed. R. Bankr. P. 6004(h); and (j) granting such other relief as is just.

Dated: September 20, 2026

Respectfully submitted,
/s/ Robert N. Bassel

Robert N. Bassel (P48420)
Attorney for Debtor
PO Box T
Clinton, MI 49236
248.677.1234
bbassel@gmail.com

## EXHIBIT 1 — PROPOSED ORDER

**UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION – FLINT**

| | |
|---|---|
| In re: | Chapter 11 |
| TELESCOPE PROPERTIES, LLC, | Case No. 24-30425-jda |
| Debtor. | Hon. Joel D. Applebaum |

_______________________________/

## ORDER GRANTING DEBTOR'S MOTION TO APPROVE SALE OF 16708 CHAPLIN AVENUE FREE AND CLEAR OF LIENS, AUTHORIZE LIMITED CLOSING DISBURSEMENTS, REQUIRE REMAINING PROCEEDS TO BE HELD IN ESCROW, AND PRESERVE § 506(c) SURCHARGE REQUEST

Upon the Debtor's Motion to Approve Sale of 16708 Chaplin Avenue Free and Clear of Liens and for Related Relief (the "Motion"), after notice and a hearing, the Court having reviewed the Motion, any responses, and the record, and for the reasons stated on the record, IT IS ORDERED:

1. The Motion is GRANTED to the extent stated in this Order.

2. The Debtor is authorized under the Confirmation Order (defined below), 11 U.S.C. § 1142(b), and, to the extent applicable, 11 U.S.C. § 363(b), to sell 16708 Chaplin Avenue, Encino, California 91436 (the "Chaplin Property") (identified in the Confirmation Order as 16708 Chaplin Ave., Los Angeles, California 91436) to Miriam Kavalerchik and Kara Goldsmith (the "Buyers") for $2,100,000 under the agreement filed with the Motion (the "Sale Agreement").

3. The sale shall close no later than October 15, 2026 unless NWL Company, LLC ("NWL") agrees in writing to a later closing.

Nothing in this Order extends the sale deadline in the Court's July 13, 2026 Stipulated Order Confirming Debtor's Second Amended Combined Plan and Disclosure Statement (the "Confirmation Order") absent NWL's written consent or further order.

4. The Chaplin Property is sold free and clear of liens, claims, encumbrances, and other interests under 11 U.S.C. § 363(f), except as expressly assumed in the Sale Agreement. Any interest not paid and released at closing attaches to the remaining sale proceeds with the same validity, extent, and priority it had immediately before closing, subject to the Debtor's surcharge request and all claims, defenses, objections, and further orders.

5. The title/escrow company handling the closing (the "Title Company") is authorized to pay from the gross sale proceeds the court-approved broker compensation and ordinary, necessary, and customary sale and closing costs, including taxes, prorations, recording charges, title charges, and escrow charges. Each charge shall be itemized on the closing statement, and no charge shall be paid that duplicates another charge or exceeds the compensation approved for the Debtor's broker. The $18,800 line item identified in the pro forma for staging, property maintenance, and security is not authorized as a closing disbursement under this paragraph and shall remain in the retained proceeds pending further order.

6. NWL shall be paid in full at closing in the amount of its then-current written payoff demand, subject to the Debtor's agreement. If there is no agreement, the sums otherwise payable to NWL shall be escrowed for a later determination as to the amount it is entitled to receive from the sale.

7. The Title Company shall remit at closing to the Office of the United States Trustee, to be held on deposit and applied to the Debtor's quarterly fees under 28 U.S.C. § 1930(a)(6) when due, the estimated United States Trustee fees of $19,875 ($18,900 for the fee generated by the closing disbursements, if $2,100,000 is disbursed in the quarter, and $975 for earlier-quarter fees), adjusted to the amount that the Office of the United States Trustee confirms in writing is due. If that Office does not accept the funds on deposit,

the Title Company shall instead hold the amount in the segregated escrow under paragraph 8. The remittance is a holding mechanism only. It does not determine whether the fees may be charged against the recoveries of the holders of the junior liens under 11 U.S.C. § 506(c), which is preserved for determination under paragraph 9, and the Court may direct any adjustment or restoration to the retained proceeds that its determination requires.

8. After payment of the amounts authorized in paragraphs 5 and 6 and the remittance authorized in paragraph 7, the Title Company shall retain all remaining sale proceeds in a segregated escrow account pending further order of this Court. No remaining proceeds shall be distributed or released to Debtor's counsel, Allstate Lending Group, Inc. and/or its servicing affiliate ("Allstate"), Othon Trinidad ("Trinidad"), Vesta Home Staging, the Debtor, or any other person or entity absent further order of this Court.

9. The Debtor's request to surcharge the junior secured recoveries under 11 U.S.C. § 506(c) is preserved for later determination on motion, as to: (a) $18,800 in staging and property-preservation expenses; (b) relevant pre-confirmation and post-confirmation Debtor's counsel fees, including the Plan and Sale related fees described in the Motion; (c) post-confirmation Chaplin sale and closing fees later allowed by the Court; and (d) United States Trustee fees, including the estimated $19,875 remitted under paragraph 7 and any further fee generated by a later disbursement of the retained proceeds. This Order does not decide those requests; all retained proceeds remain subject to further order.

10. The liens and asserted secured interests of Allstate and Trinidad attach to the retained sale proceeds with the same validity, extent, and priority they had immediately before closing, subject to the surcharge request and all claims, defenses, objections, credits, and further orders of this Court. No payment shall be made to Allstate or Trinidad from the retained proceeds except under a written agreement among the Debtor and the affected parties approved by the Court, or under a further order determining the amount. For escrow-planning purposes only, Allstate's November 3, 2023 payoff demand, good through November 30, 2023 with a stated

per diem of $29.3626, produces a per-diem-only estimate of $166,536.32 as of October 15, 2026. That estimate does not limit or establish Allstate's allowed claim.

11. The retained proceeds, together with any interest earned on them, shall remain subject to the liens, claims, priorities, surcharge requests, objections, defenses, and rights of all parties. Within seven days after closing, the Debtor shall file and serve the Title Company's final closing statement and escrow accounting showing all amounts paid or remitted under paragraphs 5, 6, and 7 and the balance retained, with account information redacted as Fed. R. Bankr. P. 9037 requires.

12. The Debtor and the Title Company are authorized to execute and deliver documents and take all actions reasonably necessary to consummate the sale, provided that no change that reduces the purchase price or materially impairs creditor treatment may be made without further Court approval.

13. Based on the record at the hearing, the Court finds that the Buyers are purchasing in good faith, that the sale price was not controlled by an agreement among potential bidders prohibited by 11 U.S.C. § 363(n), and that the Buyers are entitled to the protections of 11 U.S.C. § 363(m).

14. The fourteen-day stay under Fed. R. Bankr. P. 6004(h) is WAIVED, and this Order is effective immediately upon entry.

15. This Court retains jurisdiction to interpret, implement, and enforce this Order and to resolve disputes concerning the sale, the closing proceeds, lien priority, and the Debtor's surcharge request.

# EXHIBIT 2

**UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION – FLINT**

| | |
|---|---|
| In re: | Chapter 11 |
| TELESCOPE PROPERTIES, LLC, | Case No. 24-30425-jda |
| Debtor. | Hon. Joel D. Applebaum |

_______________________________/

## NOTICE OF DEBTOR'S MOTION TO APPROVE SALE OF 16708 CHAPLIN AVENUE FREE AND CLEAR OF LIENS AND FOR RELATED RELIEF

Telescope Properties, LLC has filed papers with the Court asking it to approve the sale of 16708 Chaplin Avenue, Encino, California to Miriam Kavalerchik and Kara Goldsmith for $2,100,000, free and clear of liens, with unpaid liens attaching to the sale proceeds; to authorize payment at closing of court-approved broker compensation, itemized ordinary closing costs, and NWL Company, LLC's first-mortgage payoff; to authorize the title/escrow company to remit estimated United States Trustee fees at closing to the Office of the United States Trustee, to be held on deposit; to require all remaining sale proceeds to be held by the title/escrow company until further Court order; and to preserve for later determination the Debtor's request to surcharge the junior secured recoveries for staging and preservation expenses, Debtor's counsel fees, United States Trustee fees, and other amounts described in the Motion.

Your rights may be affected. You should read these papers carefully and discuss them with your attorney, if you have one in this bankruptcy case. If you do not have an attorney, you may wish to consult one.

If the Court enters the requested order shortening notice, and if you do not want the Court to grant the relief requested in the Motion, or if you want the Court to consider your views on the Motion, you or your

attorney must, no later than September 29, 2026 at 2:00 p.m. Eastern Time:

1. File with the Court a written response or answer explaining your position at:

United States Bankruptcy Court
Eastern District of Michigan
226 West Second Street
Flint, Michigan 48502

If you mail your response to the Court for filing, you must mail it early enough so the Court will receive it on or before the response deadline. All attorneys are required to file pleadings electronically.

You must also send a copy to:

Robert N. Bassel (P48420), Attorney for Debtor, PO Box T, Clinton, MI 49236; bbassel@gmail.com

If the Court enters the requested expedited-hearing order, attend the hearing on the Motion on September 30, 2026 at 11:00 a.m. Eastern Time, or at such other date, time, or manner as the Court states in its order or separate notice.

If you or your attorney do not take these steps, the Court may decide that you do not oppose the relief sought in the Motion and may grant it without a hearing.

A response or answer must comply with Fed. R. Civ. P. 8(b), (c), and (e), as applicable.

Date: September 20, 2026

Signature: /s/ Robert N. Bassel
Robert N. Bassel (P48420)
Attorney for Debtor
PO Box T
Clinton, MI 49236
248.677.1234
bbassel@gmail.com

**UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION – FLINT**

| | |
|---|---|
| In re: | Chapter 11 |
| TELESCOPE PROPERTIES, LLC, | Case No. 24-30425-jda |
| Debtor. | Hon. Joel D. Applebaum |

________________________________/

**EXHIBIT 3**
**BRIEF**

A separate brief is not required under E.D. Mich. L.B.R. 9014-1(f). The legal authorities and argument supporting the requested relief are contained in the Motion.

**EXHIBIT 4**

**UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION – FLINT**

| | |
|---|---|
| In re: | Chapter 11 |
| TELESCOPE PROPERTIES, LLC, | Case No. 24-30425-jda |
| Debtor. | Hon. Joel D. Applebaum |

_______________________________/

**CERTIFICATE OF SERVICE**

I certify that on September 20, 2026, I filed the Debtor's Motion to Approve Sale of 16708 Chaplin Avenue Free and Clear of Liens and for Related Relief, with its exhibits, and the Debtor's Ex Parte Motion to Shorten Notice and Response Periods and for Expedited Hearing, using the Court's CM/ECF system, which will send notice of the filing to all registered parties, including the Office of the United States Trustee. On the same date I served both motions by e-mail on Richard LaCivita, counsel for NWL, at Richard.LaCivita@sottileandbarile.com; Allstate Lending Group, Inc. through its Chief Restructuring Officer at cro_allstate@gtllp.com and Kyra E. Andrassy, kandrassy@raineslaw.com, its counsel; and Othon Trinidad at othontrinidad70@yahoo.com. I also served the Notice of Motion and Opportunity to Object by first-class mail on Debtor’s matrix.

/s/ Robert N. Bassel
Robert N. Bassel (P48420)
PO Box T, Clinton, MI 49236
248.677.1234; bbassel@gmail.com

**UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION – FLINT**

| | |
|---|---|
| In re: | Chapter 11 |
| TELESCOPE PROPERTIES, LLC, | Case No. 24-30425-jda |
| Debtor. | Hon. Joel D. Applebaum |

________________________________/

**EXHIBIT 6**
**DOCUMENTARY EXHIBITS (INDEX)**

| Exhibit | Description |
|---|---|
| 6-A | August 22, 2026 Purchase Offer signed by Miriam Kavalerchik and Kara Goldsmith for $2,100,000. |

# EXHIBIT 6-A - AUGUST 22, 2026 PURCHASE OFFER

Docusign Envelope ID: B78D39FA-BC97-8A2C-80C7-BBCE98AB2146

CALIFORNIA ASSOCIATION OF REALTORS®

## DISCLOSURE REGARDING REAL ESTATE AGENCY RELATIONSHIP

**(As required by the Civil Code)**
**(C.A.R. Form AD, Revised 12/24)**

COLDWELL BANKER REALTY

☐ (If checked) This form is being provided in connection with a transaction for a leasehold interest exceeding one year as per Civil Code §§ 2079.13(j), (k), and (l).

When you enter into a discussion with a real estate agent regarding a real estate transaction, you should from the outset understand what type of agency relationship or representation you wish to have with the agent in the transaction.

**SELLER'S AGENT**

A Seller's agent under a listing agreement with the Seller acts as the agent for the Seller only. A Seller's agent or a subagent of that agent has the following affirmative obligations:

To the Seller: A Fiduciary duty of utmost care, integrity, honesty and loyalty in dealings with the Seller.

To the Buyer and the Seller:

(a) Diligent exercise of reasonable skill and care in performance of the agent's duties.
(b) A duty of honest and fair dealing and good faith.
(c) A duty to disclose all facts known to the agent materially affecting the value or desirability of the property that are not known to, or within the diligent attention and observation of, the parties. An agent is not obligated to reveal to either party any confidential information obtained from the other party that does not involve the affirmative duties set forth above.

**BUYER'S AGENT**

A Buyer's agent can, with a Buyer's consent, agree to act as agent for the Buyer only. This includes a Buyer's agent under a buyer-broker representation agreement with the Buyer. In these situations, the agent is not the Seller's agent, even if by agreement the agent may receive compensation for services rendered, either in full or in part from the Seller. An agent acting only for a Buyer has the following affirmative obligations:

To the Buyer: A fiduciary duty of utmost care, integrity, honesty and loyalty in dealings with the Buyer.

To the Buyer and the Seller:

(a) Diligent exercise of reasonable skill and care in performance of the agent's duties.
(b) A duty of honest and fair dealing and good faith.
(c) A duty to disclose all facts known to the agent materially affecting the value or desirability of the property that are not known to, or within the diligent attention and observation of, the parties. An agent is not obligated to reveal to either party any confidential information obtained from the other party that does not involve the affirmative duties set forth above.

**AGENT REPRESENTING BOTH SELLER AND BUYER**

A real estate agent, either acting directly or through one or more salespersons and broker associates, can legally be the agent of both the Seller and the Buyer in a transaction, but only with the knowledge and consent of both the Seller and the Buyer.

In a dual agency situation, the agent has the following affirmative obligations to both the Seller and the Buyer:

(a) A fiduciary duty of utmost care, integrity, honesty and loyalty in the dealings with either the Seller or the Buyer.
(b) Other duties to the Seller and the Buyer as stated above in their respective sections.

In representing both Seller and Buyer, a dual agent may not, without the express permission of the respective party, disclose to the other party confidential information, including, but not limited to, facts relating to either the Buyer's or Seller's financial position, motivations, bargaining position, or other personal information that may impact price, including the Seller's willingness to accept a price less than the listing price or the Buyer's willingness to pay a price greater than the price offered.

**SELLER AND BUYER RESPONSIBILITIES**

Either the purchase agreement or a separate document will contain a confirmation of which agent is representing you and whether that agent is representing you exclusively in the transaction or acting as a dual agent. Please pay attention to that confirmation to make sure it accurately reflects your understanding of your agent's role.

The above duties of the agent in a real estate transaction do not relieve a Seller or Buyer from the responsibility to protect their own interests. You should carefully read all agreements to assure that they adequately express your understanding of the transaction. A real estate agent is a person qualified to advise about real estate. If legal or tax advice is desired, consult a competent professional.

If you are a Buyer, you have the duty to exercise reasonable care to protect yourself, including as to those facts about the property which are known to you or within your diligent attention and observation.

Both Sellers and Buyers should strongly consider obtaining tax advice from a competent professional because the federal and state tax consequences of a transaction can be complex and subject to change.

Throughout your real property transaction you may receive more than one disclosure form, depending upon the number of agents assisting in the transaction. The law requires each agent with whom you have more than a casual relationship to present you with this disclosure form. You should read its contents each time it is presented to you, considering the relationship between you and the real estate agent in your specific transaction. **This disclosure form includes the provisions of §§ 2079.13 to 2079.24, inclusive, of the Civil Code set forth on page 2. Read it carefully.**

**Note: Real estate broker commissions are not set by law and are fully negotiable.**

**I/WE ACKNOWLEDGE RECEIPT OF A COPY OF THIS DISCLOSURE AND THE PORTIONS OF THE CIVIL CODE PRINTED ON THE SECOND PAGE.**

☒ Buyer ☐ Seller ☐ Landlord ☐ Tenant (Signed by: [signature] EAEFC9794183456...) *Miriam Kavalerchik* Date 8/22/2026 | 6:36:09 P

☒ Buyer ☐ Seller ☐ Landlord ☐ Tenant (DocuSigned by: Kara Goldsmith 8242059DA3664DA...) *Kara Goldsmith* Date 8/22/2026 | 6:36:16 P

Agent *Coldwell Banker Realty* DRE Lic. # *00616212*
Real Estate Broker (Firm)

By (Signed by: Lisa Chase) *Lisa Chase* DRE Lic. # *01062030* Date 8/22/2026 | 5:15:39 I
(Salesperson or Broker-Associate, if any)

**AD REVISED 12/24 (PAGE 1 OF 2)**

Docusign Envelope ID: B78D39FA-BC97-8A2C-80C7-BBCE98AB2146

## CIVIL §§ 2079.13 - 2079.24 (2079.16 APPEARS ON THE FRONT)

**2079.13**. As used in this section and §§ 2079.7 and 2079.14 to 2079.24, inclusive, the following terms have the following meanings: **(a)** "Agent" means a person acting under provisions of Title 9 (commencing with § 2295) in a real property transaction, and includes a person who is licensed as a real estate broker under Chapter 3 (commencing with § 10130) of Part 1 of Division 4 of the Business and Professions Code, and under whose license a listing is executed or an offer to purchase is obtained. The agent in the real property transaction bears responsibility for that agent's salespersons or broker associates who perform as agents of the agent. When a salesperson or broker associate owes a duty to any principal, or to any buyer or seller who is not a principal, in a real property transaction, that duty is equivalent to the duty owed to that party by the broker for whom the salesperson or broker associate functions. **(b)** "Buyer" means a transferee in a real property transaction, and includes a person who executes an offer to purchase real property from a seller through an agent, or who seeks the services of an agent in more than a casual, transitory, or preliminary manner, with the object of entering into a real property transaction. "Buyer" includes a vendee or lessee of real property. **(c)** "Commercial real property" means all real property in the state, except (1) single-family residential real property, (2) dwelling units made subject to Chapter 2 (commencing with § 1940) of Title 5, (3) a mobilehome, as defined in § 798.3, (4) vacant land, or (5) a recreational vehicle, as defined in § 799.29. **(d)** "Dual agent" means an agent acting, either directly or through a salesperson or broker associate, as agent for both the seller and the buyer in a real property transaction. **(e)** "Listing agreement" means a written contract between a seller of real property and an agent, by which the agent has been authorized to sell the real property or to find or obtain a buyer, including rendering other services for which a real estate license is required to the seller pursuant to the terms of the agreement. **(f)** "Seller's agent" means a person who has obtained a listing of real property to act as an agent for compensation. **(g)** "Listing price" is the amount expressed in dollars specified in the listing for which the seller is willing to sell the real property through the seller's agent. **(h)** "Offering price" is the amount expressed in dollars specified in an offer to purchase for which the buyer is willing to buy the real property. **(i)** "Offer to purchase" means a written contract executed by a buyer acting through a buyer's agent that becomes the contract for the sale of the real property upon acceptance by the seller. **(j)** "Real property" means any estate specified by subdivision (1) or (2) of § 761 in property, and includes (1) single-family residential property, (2) multiunit residential property with more than four dwelling units, (3) commercial real property, (4) vacant land, (5) a ground lease coupled with improvements, or (6) a manufactured home as defined in § 18007 of the Health and Safety Code, or a mobilehome as defined in § 18008 of the Health and Safety Code, when offered for sale or sold through an agent pursuant to the authority contained in § 10131.6 of the Business and Professions Code. **(k)** "Real property transaction" means a transaction for the sale of real property in which an agent is retained by a buyer, seller, or both a buyer and seller to act in that transaction, and includes a listing or an offer to purchase. **(l)** "Single-family residential property" or "single-family residential real property" means any of the following: (1) Real property improved with one to four dwelling units, including a leasehold exceeding one year's duration. (2) A unit in a residential stock cooperative, condominium, or planned unit development. (3) A mobilehome or manufactured home when offered for sale or sold through a real estate broker pursuant to § 10131.6 of the Business and Professions Code. **(m)** "Sell," "sale," or "sold" refers to a transaction for the transfer of real property from the seller to the buyer and includes exchanges of real property between the seller and buyer, transactions for the creation of a real property sales contract within the meaning of § 2985, and transactions for the creation of a leasehold exceeding one year's duration. **(n)** "Seller" means the transferor in a real property transaction and includes an owner who lists real property with an agent, whether or not a transfer results, or who receives an offer to purchase real property of which he or she is the owner from an agent on behalf of another. "Seller" includes both a vendor and a lessor of real property. **(o)** "Buyer's agent" means an agent who represents a buyer in a real property transaction. **(p)** "Buyer-broker representation agreement" means a written contract between a buyer of real property and a buyer's agent by which the buyer's agent has been authorized by the buyer to provide services set forth in subdivision (a) of § 10131 of the Business and Professions Code for or on behalf of the buyer for which a real estate license is required pursuant to the terms of the contract.

**2079.14. (a)** A copy of the disclosure form specified in § 2079.16 shall be provided in a real property transaction as follows: (1) The seller's agent, if any, shall provide the disclosure form to the seller before entering into a listing agreement. (2) The buyer's agent shall provide the disclosure to the buyer as soon as practicable before the execution of a buyer-broker representation agreement and execution of the buyer's offer to purchase. If the offer to purchase is not prepared by the buyer's agent, the buyer's agent shall present the disclosure form to the buyer not later than the next business day after receiving the offer to purchase from the buyer. **(b)** The agent providing the disclosure form specified in § 2079.16 shall obtain a signed acknowledgement of receipt from the buyer or seller except as provided in § 2079.15.

**2079.15.** In any circumstance in which the seller or buyer refuses to sign an acknowledgment of receipt pursuant to § 2079.14, the agent shall set forth, sign, and date a written declaration of the facts of the refusal.

**2079.16** Reproduced on Page 1 of this AD form.

**2079.17(a)** As soon as practicable, the buyer's agent shall disclose to the buyer and seller whether the agent is acting in the real property transaction as the buyer's agent, or as a dual agent representing both the buyer and the seller. This relationship shall be confirmed in the contract to purchase and sell real property or in a separate writing executed or acknowledged by the seller, the buyer, and the buyer's agent prior to or coincident with execution of that contract by the buyer and the seller, respectively. **(b)** As soon as practicable, the seller's agent shall disclose to the seller whether the seller's agent is acting in the real property transaction as the seller's agent, or as a dual agent representing both the buyer and seller. This relationship shall be confirmed in the contract to purchase and sell real property or in a separate writing executed or acknowledged by the seller and the seller's agent prior to or coincident with the execution of that contract by the seller. **(c)** The confirmation required by subdivisions (a) and (b) shall be in the following form:

Seller's Brokerage Firm ____ DO NOT COMPLETE. SAMPLE ONLY ____ License Number ______________
Is the broker of (check one): ☐ the seller; or ☐ both the buyer and seller. (dual agent)
Seller's Agent ____ DO NOT COMPLETE. SAMPLE ONLY ____ License Number ______________
Is (check one): ☐ the Seller's Agent. (salesperson or broker associate) ☐ both the Buyer's and Seller's Agent. (dual agent)
Buyer's Brokerage Firm ____ DO NOT COMPLETE. SAMPLE ONLY ____ License Number ______________
Is the broker of (check one): ☐ the buyer; or ☐ both the buyer and seller. (dual agent)
Buyer's Agent ____ DO NOT COMPLETE. SAMPLE ONLY ____ License Number ______________
Is (check one): ☐ the Buyer's Agent. (salesperson or broker associate) ☐ both the Buyer's and Seller's Agent. (dual agent)

**(d)** The disclosures and confirmation required by this section shall be in addition to the disclosure required by § 2079.14. An agent's duty to provide disclosure and confirmation of representation in this section may be performed by a real estate salesperson or broker associate affiliated with that broker.

**2079.18** (Repealed pursuant to AB-1289)

**2079.19** The payment of compensation or the obligation to pay compensation to an agent by the seller or buyer is not necessarily determinative of a particular agency relationship between an agent and the seller or buyer. A listing agent and a selling agent may agree to share any compensation or commission paid, or any right to any compensation or commission for which an obligation arises as the result of a real estate transaction, and the terms of any such agreement shall not necessarily be determinative of a particular relationship.

**2079.20** Nothing in this article prevents an agent from selecting, as a condition of the agent's employment, a specific form of agency relationship not specifically prohibited by this article if the requirements of § 2079.14 and § 2079.17 are complied with.

**2079.21 (a)** A dual agent may not, without the express permission of the seller, disclose to the buyer any confidential information obtained from the seller. **(b)** A dual agent may not, without the express permission of the buyer, disclose to the seller any confidential information obtained from the buyer. **(c)** "Confidential information" means facts relating to the client's financial position, motivations, bargaining position, or other personal information that may impact price, such as the seller is willing to accept a price less than the listing price or the buyer is willing to pay a price greater than the price offered. **(d)** This section does not alter in any way the duty or responsibility of a dual agent to any principal with respect to confidential information other than price.

**2079.22** Nothing in this article precludes a seller's agent from also being a buyer's agent. If a seller or buyer in a transaction chooses to not be represented by an agent, that does not, of itself, make that agent a dual agent.

**2079.23 (a)** A contract between the principal and agent may be modified or altered to change the agency relationship at any time before the performance of the act which is the object of the agency with the written consent of the parties to the agency relationship. **(b)** A lender or an auction company retained by a lender to control aspects of a transaction of real property subject to this part, including validating the sales price, shall not require, as a condition of receiving the lender's approval of the transaction, the homeowner or listing agent to defend or indemnify the lender or auction company from any liability alleged to result from the actions of the lender or auction company. Any clause, provision, covenant, or agreement purporting to impose an obligation to defend or indemnify a lender or an auction company in violation of this subdivision is against public policy, void, and unenforceable.

**2079.24** Nothing in this article shall be construed to either diminish the duty of disclosure owed buyers and sellers by agents and their associate licensees, subagents, and employees or to relieve agents and their associate licensees, subagents, and employees from liability for their conduct in connection with acts governed by this article or for any breach of a fiduciary duty or a duty of disclosure.

CALIFORNIA ASSOCIATION OF REALTORS®

# CALIFORNIA RESIDENTIAL PURCHASE AGREEMENT AND JOINT ESCROW INSTRUCTIONS

**(C.A.R. FORM RPA, Revised 6/26)**

COLDWELL BANKER REALTY

Date Prepared: *August 22, 2026*

1. **OFFER:**
   A. **THIS IS AN OFFER FROM** *Miriam Kavalerchik, Kara Goldsmith* ("Buyer").
   B. **THE PROPERTY** to be acquired is *16708 Chaplin Ave*, situated in *Encino* (City), *Los Angeles* (County), California, *91436* (Zip Code), Assessor's Parcel No(s). *2289027017* ("Property").
   **(Postal/Mailing address may be different from city jurisdiction. Buyer is advised to investigate.)**
   C. **THE TERMS OF THE PURCHASE ARE SPECIFIED BELOW AND ON THE FOLLOWING PAGES.**
   D. Buyer and Seller are referred to herein as the "Parties." Brokers and Agents are **not** Parties to this Agreement.
2. **AGENCY:**
   A. **DISCLOSURE:** The Parties each acknowledge receipt of a "Disclosure Regarding Real Estate Agency Relationship" (C.A.R. Form AD) if represented by a real estate licensee. Buyer's Agent is not legally required to give to Seller's Agent the AD form Signed by Buyer. Seller's Agent is not legally obligated to give to Buyer's Agent the AD form Signed by Seller.
   B. **CONFIRMATION:** The following agency relationships are hereby confirmed for this transaction.
   **Seller's Brokerage Firm** *Sandlot Homes* License Number *01920257*
   Is the broker of (check one): [X] the Seller; or [ ] both the Buyer and Seller (Dual Agent).
   Seller's Agent *Amanda Lockwood* License Number *02030430*
   Is (check one): [X] the Seller's Agent. (Salesperson or broker associate); or [ ] both the Buyer's and Seller's Agent (Dual Agent).
   **Buyer's Brokerage Firm** *Coldwell Banker Realty* License Number *00616212*
   Is the broker of (check one): [X] the Buyer; or [ ] both the Buyer and Seller (Dual Agent).
   **Buyer's Agent** *Lisa Chase* License Number *01062030*
   Is (check one): [X] the Buyer's Agent (Salesperson or broker associate); or [ ] both the Buyer's and Seller's Agent (Dual Agent).
   C. [ ] More than one Brokerage represents [ ] Seller, [ ] Buyer. See, Additional Broker Acknowledgement (C.A.R. Form ABA).
   D. **POTENTIALLY COMPETING BUYERS AND SELLERS:** The Parties are advised to discuss with their Agent the broker's policy on dual agency and multiple representation of competing buyers and sellers.
3. **TERMS OF PURCHASE AND ALLOCATION OF COSTS:** The items in this paragraph are contractual terms of the Agreement. Referenced paragraphs provide further explanation. This form is 17 pages. The Parties are advised to read all 17 pages.

| | Para # | Paragraph Title or Contract Term | Terms and Conditions | Additional Terms |
|---|---|---|---|---|
| A | 5, 5B (cash) | **Purchase Price** | $ *2,100,000.00* | [ ] All Cash |
| B | | **Close Of Escrow (COE)** | [X] *30* Days after Acceptance<br>OR on [ ] ____ (date) | |
| C | 32A | **Expiration of Offer** | 3 calendar days after all Buyer Signature(s) or *August 22, 2026* (date), at 5PM or *8:00* [ ] AM/ [X] PM | |
| D(1) | 5A(1) | **Initial Deposit Amount** | $ *63,000.00* ( *3.00* % of purchase price) (% number above is for calculation purposes and is not a contractual term) | within 3 (or ____) business days after Acceptance by wire transfer **OR** [ ] ____ |
| D(2) | 5A(2) | [ ] **Increased Deposit** | See attached Increased Deposit Addendum (C.A.R. Form IDA) | |
| E(1) | 5C(1) | **Loan Amount(s):** First<br>Interest Rate<br>Points<br>If FHA or VA checked, Deliver list of lender required repairs | $ *1,470,000.00* ( *70.00* % of purchase price)<br>Fixed rate or [ ] Initial adjustable rate<br>• not to exceed *7.000* %<br>• Buyer to pay up to ____ points to obtain the rate above<br>17 (or ____) Days after Acceptance | Conventional or, if checked,<br>[ ] FHA (Forms FVAC/HID attached)<br>[ ] VA (Form FVAC attached)<br>[ ] Seller Financing (Form SFA attached)<br>[ ] Other: ____ |
| E(2) | 5C(2) | Additional Financed Amount<br>Interest Rate<br>Points | $ ____ ( ____ % of purchase price)<br>Fixed rate or [ ] Initial adjustable rate<br>• not to exceed ____ %<br>• Buyer to pay up to ____ points to obtain rate above | Conventional or, if checked,<br>[ ] Seller Financing (Form SFA attached)<br>[ ] Other: ____ |
| E(3) | 7A | **Occupancy Type** | Primary, or if checked, [ ] Secondary [ ] Investment | |
| F | 5D | **Balance of Down Payment** | $ *567,000.00* | |
| | | **PURCHASE PRICE TOTAL** | $ *2,100,000.00* | |

© 2025, California Association of REALTORS®, Inc.

| | | | | |
|---|---|---|---|---|
| **G** | **SELLER PAYMENT TO COVER BUYER EXPENSES AND COSTS** | | | |
| **G(1)** | 5E | ☐ **Seller Credit to Buyer** | $ ________________ | For closing costs |
| **G(2)** | | ☐ **Other Seller Credits/Payments** (does not include buyer broker compensation) | $ ________________ For: ________________ .<br>$ ________________ For: ________________ . | |
| **G(3)** | 18A | ☒ **Seller Payment to Compensate Buyer's Broker** | **Seller agrees to pay Buyer's Broker,** out of transaction proceeds, 2.500 % of the final purchase price AND, if applicable $ ____________ OR, if checked ☐ $____________ . | |
| **H(1)** | 5B | **Verification of All Cash** (sufficient funds) | Attached to the offer or ☐ 3 (or _____) Days after Acceptance | |
| **H(2)** | 6A | **Verification of Down Payment and Closing Costs** | Attached to the offer or ☐ 3 (or _____) Days after Acceptance | |
| **H(3)** | 6B | **Verification of Loan Application** | Attached to the offer or ☐ 3 (or _____) Days after Acceptance | ☐ Prequalification ☒ Preapproval<br>☐ Fully underwritten preapproval |
| **I** | | | **Intentionally Left Blank** | |
| **J** | 16 | **Final Verification of Condition** | 5 (or _____) Days prior to COE | |
| **K** | 23 | **Assignment Request** | 17 (or _____) Days after Acceptance | |
| **L** | | **CONTINGENCIES** | **TIME TO REMOVE CONTINGENCIES** | **CONTINGENCY REMOVED** |
| **L(1)** | 8A | **Loan(s)** | 17 (or _____) Days after Acceptance | ☐ No loan contingency |
| **L(2)** | 8B | **Appraisal:** Appraisal contingency based upon appraised value at a minimum: **(i)** of purchase price; OR **(ii)** ☐ $ ____________ less than the final purchase price ("Appraisal Gap"). | 17 (or _____) Days after Acceptance | ☐ No appraisal contingency<br>Removal of appraisal contingency does not eliminate appraisal cancellation rights in FVAC. |
| **L(3)** | 8C, 12 | **Investigation of Property** | 17 (or 10 ) Days after Acceptance | REMOVAL OR WAIVER OF CONTINGENCY:<br>Any contingency in L(1)-L(8) may be removed or waived by checking the applicable box above or attaching a Contingency Removal (C.A.R. Form CR-B) and checking the applicable box therein. Removal or Waiver at time of offer is against Agent advice. See **paragraph 8I.**<br>☐ **CR-B attached** |
| | | **Informational Access to Property** | 17 (or 10 ) Days after Acceptance | |
| | | Buyer's right to access the Property for informational purposes is **NOT** a contingency, does **NOT** create cancellation rights, and applies even if contingencies are removed. | | |
| **L(4)** | 8D | **Insurance** | 17 (or 10 ) Days after Acceptance | |
| **L(5)** | 8E, 14A | **Review of Seller Documents** | 17 (or 10 ) Days after Acceptance, or 5 Days after Delivery, whichever is later | |
| **L(6)** | 8F, 13A | **Preliminary ("Title") Report** | 17 (or 10 ) Days after Acceptance, or 5 Days after Delivery, whichever is later | |
| **L(7)** | 8G, 11M | **Common Interest Disclosures** Per Civil Code § 4525 or Agreement | 17 (or 10 ) Days after Acceptance, or 5 Days after Delivery, whichever is later | |
| **L(8)** | 8H, 9B(6) | **Review of leased or liened items** (E.g. solar panels or propane tanks) | 17 (or 10 ) Days after Acceptance, or 5 Days after Delivery, whichever is later | |
| **L(9)** | 8K | **Sale of Buyer's Property** Sale of Buyer's property is not a contingency, UNLESS checked here: ☐ **C.A.R. Form COP attached** | | |
| **M** | | **Possession** | **Time for Performance** | **Additional Terms** |
| **M(1)** | | **Time of Possession** | Upon notice of recordation, OR ☐ 6 PM or _____ ☐ AM/ ☐ PM on date specified, as applicable, in 3M(2) or attached TOPA. | |
| **M(2)** | 7D | **Seller Occupied or Vacant units** | COE date or, if checked below,<br>☐ _____ days after COE (29 or fewer days)<br>☐ _____ days after COE (30 or more days) | C.A.R. Form SIP attached if 29 or fewer days. C.A.R. Form RLAS attached if 30 or more days. |
| **M(3)** | 4A, 7A | **Occupied units by tenants or anyone other than the Seller** | Subject to tenant rights, unless primary or secondary residence in **3E(3)**, or Otherwise Agreed (TOPA may be used) | See **7A** if TOPA is not attached.<br>☐ Tenant Occupied Property Addendum (C.A.R. Form TOPA) attached. |
| **N** | | **Documents/Fees/Compliance** | **Time for Performance** | |
| **N(1)** | 14A | Seller Delivery of Documents | 7 (or 3 ) Days after Acceptance | |
| **N(2)** | 19B | Sign and return Escrow Holder Provisions and Instructions | 5 (or _____) Days after Delivery | |
| **N(3)** | 11M(2) | Time to pay fees for ordering HOA Documents | 3 (or _____) Days after Acceptance | |
| **N(4)** | 10B(1) | Install smoke alarm(s), CO detector(s), water heater bracing | 7 (or _____) Days after Acceptance | |
| **N(5)** | 24 | Evidence of representative authority | 3 Days after Acceptance | |
| **O** | | | **Intentionally Left Blank** | |



Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX 75201 www.lwolf.com 16708 Chaplin

| P | Items Included and Excluded | | | |
|---|---|---|---|---|
| P(1) | 9 | **Items Included - All items specified in Paragraph 9B are included and the following, if checked and existing:** | | |
| | | [X] Stove(s), oven(s), stove/oven combo(s); [X] Refrigerator(s); [X] Wine Refrigerator(s); [ ] Washer(s); [ ] Dryer(s); [X] Dishwasher(s); [X] Microwave(s); **Additional Items Included:** [ ] ______. | [X] Video doorbell(s); [X] Security camera equipment; [X] Security system(s)/alarm(s), other than separate video doorbell and camera equipment; [X] Smart home control devices; [X] Wall mounted brackets for video or audio equipment; [ ] ______. [ ] ______. | [ ] Above-ground pool(s) / [ ] spa(s); [X] Bathroom mirrors, unless excluded below; [X] Electric car charging systems and stations; [X] Potted trees/shrubs; [ ] ______. [ ] ______. |
| P(2) | | **Excluded Items:** [ ] ______; | [ ] ______; | [ ] ______; |

| Q | Allocation of Costs | | | |
|---|---|---|---|---|
| | **Para #** | **Item Description** | **Who Pays** (if Both is checked, cost to be split equally unless Otherwise Agreed) | **Additional Terms** |
| Q(1) | 10A, 11A | Natural Hazard Zone Disclosure Report, including tax information | [ ] Buyer [X] Seller [ ] Both ______ | [X] Environmental [ ] Other ______ |
| | | | [ ] Provided by: *seller's choice* | |
| Q(2) | | [ ] Optional Wildfire Disclosure Report *Click here for Additional Report* | [ ] Buyer [X] Seller [ ] Both ______ Provided by: *Click here to select Wildfire Service Provider* | |
| Q(3) | | (A) ______ Report (B) ______ Report | [ ] Buyer [ ] Seller [ ] Both ______ [ ] Buyer [ ] Seller [ ] Both ______ | |
| Q(4) | 10B(1) | Smoke alarms, CO detectors, water heater bracing | [ ] Buyer [X] Seller [ ] Both ______ | |
| Q(5) | 10A 10B(2) | Government Required Point of Sale **inspections, reports** | [ ] Buyer [ ] Seller [ ] Both ______ | |
| Q(6) | 10B(2) | Government Required Point of Sale **corrective/remedial actions** | [ ] Buyer [ ] Seller [ ] Both ______ | |
| Q(7) | 19B | Escrow Fee | [ ] Buyer [ ] Seller [ ] Both ______ Escrow Holder: *seller's choice* | [X] Each to pay their own fees |
| Q(8) | 13 | Owner's title insurance policy | [ ] Buyer [X] Seller [ ] Both ______ Title Co. (If different from Escrow Holder): *seller's choice* | |
| Q(9) | | Buyer's Lender title insurance policy | Buyer | Unless Otherwise Agreed, Buyer shall purchase any title insurance policy insuring Buyer's lender. |
| Q(10) | | County transfer tax, fees | [ ] Buyer [X] Seller [ ] Both ______ | |
| Q(11) | | City transfer tax, fees | [ ] Buyer [X] Seller [ ] Both ______ | |
| Q(12) | 11M(2) | HOA fee for preparing disclosures | Seller | |
| Q(13) | | HOA certification fee | Buyer | |
| Q(14) | | HOA transfer fees | [ ] Buyer [ ] Seller [ ] Both ______ | Unless Otherwise Agreed, Seller shall pay for separate HOA move-out fee and Buyer shall pay for separate move-in fee. Applies if separately billed or itemized with cost in transfer fee. |
| Q(15) | | Private transfer fees | Seller, or if checked, [ ] Buyer [ ] Both ______ | |
| Q(16) | 11O | [ ] Septic, Well, Propane Tank, and/or Property Boundaries (Survey) | See Septic, Well, Propane Tank, and Property Boundaries Inspection and Allocation of Costs Addendum (C.A.R. Form SWPI-C). | |
| Q(17) | | ______ fees or costs | [ ] Buyer [ ] Seller [ ] Both ______ | |
| Q(18) | 10C | Home warranty plan chosen by Buyer. Coverage includes, but is not limited to: ______ ______ | [ ] Buyer [X] Seller [ ] Both ______ Issued by: *Buyer's choice* [ ] Buyer waives home warranty plan | If Seller or Both checked, Seller's cost not to exceed $ *800.00*. |

| R | OTHER TERMS: ______ |
|---|---|



Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX 75201 www.lwolf.com 16708 Chaplin

4. **PROPERTY ADDENDA AND ADVISORIES:** (check all that apply)
   A. **PROPERTY TYPE ADDENDA:** This Agreement is subject to the terms contained in the Addenda checked below:
   - [ ] Tenant Occupied Property Addendum (C.A.R. Form TOPA) (Should be checked whether current tenants will remain or not.)
   - [ ] Probate Agreement Purchase Addendum (C.A.R. Form PA-PA)
   - [ ] Manufactured Home Purchase Addendum (C.A.R. Form MH-PA)
   - [ ] Tenancy in Common Purchase Addendum (C.A.R. Form TIC-PA)
   - [ ] Stock Cooperative Purchase Addendum (C.A.R. Form COOP-PA)
   - [ ] Mixed Use Purchase Addendum (C.A.R. Form MU-PA) [ ] Other ____

   B. **OTHER ADDENDA (AND DISCLOSURES):** This Agreement is subject to the terms contained in the Addenda checked below:
   - [ ] Addendum # ____ (C.A.R. Form ADM) [ ] Short Sale Addendum (C.A.R. Form SSA)
   - [ ] Back Up Offer Addendum (C.A.R. Form BUO) [ ] Court Confirmation Addendum (C.A.R. Form CCA)
   - [ ] Septic, Well, Propane Tank, and Property Boundaries Inspection and Allocation of Costs Addendum (C.A.R. Form SWPI-C)
   - [ ] Buyer Intent to Exchange Addendum (C.A.R. Form BXA) [ ] Seller Intent to Exchange Addendum (C.A.R. Form SXA)
   - [X] Disclosure Regarding Real Estate Agency Relationships (C.A.R. Form AD)
   - [ ] Other ____ [ ] Other ____

   C. **BUYER AND SELLER ADVISORIES: (Note: All Advisories below are provided for reference purposes only and are not intended to be incorporated into this Agreement.)**
   - [X] Buyer's Investigation Advisory (C.A.R. Form BIA) [X] Fair Housing and Discrimination Advisory (C.A.R. Form FHDA)
   - [X] Wire Fraud Advisory (C.A.R. Form WFA) [X] Buyer Homeowner Insurance Advisory (C.A.R. Form BHIA)
   - [ ] Wildfire Disaster Advisory (C.A.R. Form WFDA) [ ] Statewide Buyer and Seller Advisory (C.A.R. Form SBSA)
   - [ ] Trust Advisory (C.A.R. Form TA) [ ] Probate Advisory (C.A.R. Form PA)
   - [ ] REO Advisory (C.A.R. Form REO) [ ] Other ____
   - [ ] Other ____ [ ] Other ____

5. **ADDITIONAL TERMS AFFECTING PURCHASE PRICE:** Buyer represents that funds will be good when deposited with Escrow Holder.
   A. **DEPOSIT:**
   (1) **INITIAL DEPOSIT:** Buyer shall deliver deposit directly to Escrow Holder. If a method other than wire transfer is specified in **paragraph 3D(1)** and such method is unacceptable to Escrow Holder, then upon notice from Escrow Holder, delivery shall be by wire transfer.
   (2) **RETENTION OF DEPOSIT: Paragraph 29, if initialed by all Parties or otherwise incorporated into this Agreement, specifies a remedy for Buyer's default. Buyer and Seller are advised to consult with a qualified California real estate attorney: (i) Before adding any other clause specifying a remedy (such as release or forfeiture of deposit or making a deposit non-refundable) for failure of Buyer to complete the purchase. Any such clause shall be deemed invalid unless the clause independently satisfies the statutory liquidated damages requirements set forth in the Civil Code; and (ii) Regarding possible liability and remedies if Buyer fails to deliver the deposit.**

   B. **ALL CASH OFFER:** If an all cash offer is specified in **paragraph 3A**, no loan is needed to purchase the Property. This Agreement is NOT contingent on Buyer obtaining a loan. Buyer shall, within the time specified in **paragraph 3H(1)**, Deliver written verification of funds sufficient for the purchase price and closing costs.

   C. **LOAN(S):**
   (1) **FIRST LOAN:** This loan will provide for conventional financing **UNLESS** FHA, VA, Seller Financing (C.A.R. Form SFA), or Other is checked in **paragraph 3E(1)**.
   (2) **ADDITIONAL FINANCED AMOUNT:** If an additional financed amount is specified in **paragraph 3E(2)**, that amount will provide for conventional financing **UNLESS** Seller Financing (C.A.R. Form SFA), or Other is checked in **paragraph 3E(2)**.
   (3) **BUYER'S LOAN STATUS:** Buyer authorizes Seller and Seller's Authorized Agent to contact Buyer's lender(s) to determine the status of any Buyer's loan specified in **paragraph 3E**, or any alternate loan Buyer pursues, whether or not a contingency of this Agreement. If the contact information for Buyer's lender(s) is different from that provided under the terms of **paragraph 6B**, Buyer shall Deliver the updated contact information within 1 Day of Seller's request.
   (4) **FHA/VA: If FHA or VA is checked in paragraph 3E(1),** a FHA/VA amendatory clause (C.A.R. Form FVAC) shall be incorporated and Signed by all Parties. Buyer shall, within the time specified in **paragraph 3E(1),** Deliver to Seller written notice (C.A.R. Form RR or AEA) **(i)** of any lender requirements that Buyer requests Seller to pay for or otherwise correct or **(ii)** that there are no lender requirements. Notwithstanding Seller's agreement that Buyer may obtain FHA or VA financing, Seller has no obligation to pay or satisfy any or all lender requirements unless agreed in writing.

   D. **BALANCE OF PURCHASE PRICE (DOWN PAYMENT, paragraph 3F) (including all-cash funds)** to be deposited with Escrow Holder pursuant to Escrow Holder instructions.

   E. **LIMITS ON CREDITS TO BUYER:** Any credit to Buyer as specified in **paragraph 3G(1)** or Otherwise Agreed, from any source, for closing or other costs that is agreed to by the Parties ("Contractual Credit") shall be disclosed to Buyer's lender, if any, and made at Close Of Escrow. If the total credit allowed by Buyer's lender ("Lender Allowable Credit") is less than the Contractual Credit, then **(i)** the Contractual Credit from Seller shall be reduced to the Lender Allowable Credit, and **(ii)** in the absence of a separate written agreement between the Parties, there shall be no automatic adjustment to the purchase price to make up for the difference between the Contractual Credit and the Lender Allowable Credit.

6. **ADDITIONAL FINANCING TERMS:**
   A. **VERIFICATION OF DOWN PAYMENT AND CLOSING COSTS:** Written verification of Buyer's down payment and closing costs, within the time specified in **paragraph 3H(2)** may be made by Buyer or Buyer's lender or loan broker pursuant to **paragraph 6B**.

   B. **VERIFICATION OF LOAN APPLICATIONS:** Buyer shall Deliver to Seller, within the time specified in **paragraph 3H(3)** a letter from Buyer's lender or loan broker stating that, based on a review of Buyer's written application and credit report, Buyer is prequalified or preapproved for any NEW loan specified in **paragraph 3E**. If any loan specified in **paragraph 3E** is an adjustable rate loan, the prequalification or preapproval letter shall be based on the qualifying rate, not the initial loan rate.

   C. **BUYER STATED FINANCING:** Seller is relying on Buyer's representation of the type of financing specified (including, but not limited to, as applicable, all cash, amount of down payment, or contingent or non-contingent loan). Seller has agreed to a specific closing date, purchase price, and to sell to Buyer in reliance on Buyer's specified financing. Buyer shall pursue the financing specified in this Agreement, even if Buyer also elects to pursue an alternative form of financing. Seller has no obligation to cooperate with Buyer's efforts to obtain any financing other than that specified in this Agreement but shall not interfere with closing at the purchase price on the COE date (**paragraph 3B**) even if based upon alternate financing. Buyer's inability to obtain alternate financing does not excuse Buyer from the obligation to purchase the Property and close escrow as specified in this Agreement.


Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX 75201 www.lwolf.com 16708 Chaplin

**7. CLOSING AND POSSESSION:**

**A. OCCUPANCY:** If Buyer intends to occupy as a primary or secondary residence (see **paragraph 3E(3)**), and unless Otherwise Agreed, such as in C.A.R. Form TOPA: **(i)** the unit Buyer intends to occupy shall be vacant at the time possession is delivered to Buyer, and **(ii)** if the Property contains more than one unit, within **3 Days** after Acceptance Buyer shall give Seller written notice of which unit Buyer intends to occupy. Occupancy may impact available financing. **Seller shall disclose to Buyer if occupied by tenants or persons other than Seller, and attach C.A.R. Form TOPA in a counter offer if not part of Buyer's offer.**

**B. CONDITION OF PROPERTY ON CLOSING:**
Unless Otherwise Agreed: **(i)** the Property shall be delivered "**As-Is**" in its PRESENT physical condition as of the date of Acceptance; **(ii)** the Property, including pool, spa, landscaping and grounds, is to be maintained in substantially the same condition as on the date of Acceptance; **(iii)** Except as specified in **paragraph 9C**, Seller is not responsible to repair any holes left after the removal of any wall hangings (such as pictures and mirrors), brackets, nails or other fastening devices; and **(iv)** all debris and personal property not included in the sale shall be removed by Close Of Escrow or at the time possession is delivered to Buyer, if not on the same date. If items are not removed when possession is delivered to Buyer, all items shall be deemed abandoned. Buyer, after first Delivering to Seller written notice to remove the items within **3 Days**, may pay to have such items removed or disposed of and may bring Legal Action, as per this Agreement, to receive reasonable costs from Seller.

**C. Buyer is strongly advised to conduct investigations of the entire Property in order to determine its present condition. Seller and Agents may not be aware of all defects affecting the Property or other factors that Buyer considers important. Property improvements may not be built according to code, in compliance with current Law, or have had all required permits issued and/or finalized.**

**D. SELLER REMAINING IN POSSESSION AFTER CLOSE OF ESCROW:** If Seller has the right to remain in possession after Close Of Escrow pursuant to **paragraph 3M(2)** or as Otherwise Agreed: The Parties are advised to **(i)** consult with their insurance and legal advisors for information about liability and damage or injury to persons and personal and real property; and **(ii)** consult with a qualified California real estate attorney where the Property is located to determine the ongoing rights and responsibilities of both Buyer and Seller with regard to each other, including possible tenant rights, and what type of written agreement to use to document the relationship between the Parties. Buyer is advised to consult with Buyer's lender about the impact of Seller's occupancy on Buyer's loan.

**E. WARRANTIES:** At Close Of Escrow: **(i)** Seller assigns to Buyer any assignable warranty rights for items included in the sale; and **(ii)** Seller shall Deliver to Buyer available Copies of any such warranties. Agents cannot and will not determine the assignability of any warranties.

**F. ACCESS:** Seller shall, on Close Of Escrow unless Otherwise Agreed and even if Seller remains in possession, provide keys, passwords, codes and/or means to operate all locks, mailboxes, security systems, alarms, home automation systems, intranet and Internet-connected devices included in the purchase price, garage door openers, and all items included in either **paragraph 3P** or **paragraph 9**. If the Property is a condominium or located in a common interest development, Seller shall be responsible for securing or providing any such items for Association amenities, facilities, and access. Buyer may be required to pay a deposit to the Homeowners' Association ("HOA") to obtain keys to accessible HOA facilities.

**8. CONTINGENCIES AND REMOVAL OF CONTINGENCIES:**

**A. LOAN(S):**

(1) This Agreement is, **unless otherwise specified in paragraph 3L(1) or an attached CR-B form**, contingent upon Buyer obtaining the loan(s) specified. If contingent, Buyer shall act diligently and in good faith to obtain the designated loan(s). **If there is no appraisal (or insurance) contingency or the appraisal (or insurance) contingency has been waived or removed, then failure of the Property to appraise at the purchase price (or a lender conditioning the loan on obtaining insurance) does not entitle Buyer to exercise the cancellation right pursuant to the loan contingency if Buyer is otherwise qualified for the specified loan and Buyer is able to satisfy lender's non-appraisal (or non-insurance) conditions for closing the loan.**

(2) Buyer is advised to investigate the insurability of the Property as early as possible, as this may be a requirement for lending. Buyer's ability to obtain insurance for the Property, including fire insurance, is part of Buyer's Insurance contingency. Failure of Buyer to obtain insurance may justify cancellation based on the Insurance contingency but not the loan contingency.

(3) Buyer's contractual obligations regarding deposit, balance of down payment and closing costs **are not contingencies** of this Agreement, unless Otherwise Agreed.

(4) If there is an appraisal contingency, removal of the loan contingency shall not be deemed removal of the appraisal contingency.

(5) **NO LOAN CONTINGENCY:** If "No loan contingency" is checked in **paragraph 3L(1)**, obtaining any loan specified is NOT a contingency of this Agreement. If Buyer does not obtain the loan specified, and as a result is unable to purchase the Property, Seller may be entitled to Buyer's deposit or other legal remedies.

**B. APPRAISAL:**

(1) This Agreement is, **unless otherwise specified in paragraph 3L(2) or an attached CR-B form**, contingent upon a written appraisal of the Property by a licensed or certified appraiser at no less than the amount specified in **paragraph 3L(2)**, without requiring repairs or improvements to the Property. Appraisals are often a reliable source to verify square footage of the subject Property. However, the ability to cancel based on the measurements provided in an appraisal falls within the Investigation of Property contingency. The appraisal contingency is solely limited to the value determined by the appraisal. For any cancellation based upon this appraisal contingency, Buyer shall Deliver a Copy of the written appraisal to Seller, upon request by Seller.

(2) **NO APPRAISAL CONTINGENCY:** If "No appraisal contingency" is checked in **paragraph 3L(2)**, then Buyer may not use the loan contingency specified in **paragraph 3L(1)** to cancel this Agreement if the sole reason for not obtaining the loan is that the appraisal relied upon by Buyer's lender values the property at an amount less than that specified in **paragraph 3L(2)**. If Buyer is unable to obtain the loan specified solely for this reason, Seller may be entitled to Buyer's deposit or other legal remedies.

(3) **FAIR APPRAISAL ACT NOTICE:**

(A) Any appraisal of the property is required to be unbiased, objective, and not influenced by improper or illegal considerations, including, but not limited to, any of the following: race, color, religion (including religious dress, grooming practices, or both), gender (including, but not limited to, pregnancy, childbirth, breastfeeding, and related conditions, and gender identity and gender expression), sexual orientation, marital status, medical condition, military or veteran status, national origin (including language use and possession of a driver's license issued to persons unable to provide their presence in the United States is authorized under federal law), source of income, ancestry, disability (mental and physical, including, but not limited to, HIV/AIDS status, cancer diagnosis, and genetic characteristics), genetic information, or age.

(B) If a buyer or seller believes that the appraisal has been influenced by any of the above factors, the seller or buyer can report this information to the lender or mortgage broker that retained the appraiser and may also file a complaint with the Bureau of Real Estate Appraisers at https://www2.brea.ca.gov/complaint/ or call (916) 552-9000 for further information on how to file a complaint.

C. **INVESTIGATION OF PROPERTY:** This Agreement is, as specified in **paragraph 3L(3)**, contingent upon Buyer's acceptance of the condition of, and any other matter affecting, the Property. See **paragraph 12.**

D. **INSURANCE:** This Agreement is, as specified in **paragraph 3L(4)**, contingent upon Buyer's assessment of the availability and approval of the cost for any insurance policy desired under this Agreement.

E. **REVIEW OF SELLER DOCUMENTS:** This Agreement is, as specified in **paragraph 3L(5)**, contingent upon Buyer's review and approval of Seller's documents required in **paragraph 14A**.

F. **TITLE:**

(1) This Agreement is, as specified in **paragraph 3L(6)**, contingent upon Buyer's ability to obtain the title policy provided for in **paragraph 13F** and on Buyer's review of a current Preliminary Report and items that are disclosed or observable even if not on record or not specified in the Preliminary Report, and satisfying Buyer regarding the current status of title. Buyer is advised to review all underlying documents and other matters affecting title, including, but not limited to, any documents or deeds referenced in the Preliminary Report and any plotted easements.

(2) Buyer has **5 Days** after receipt to review a revised Preliminary Report, if any, furnished by the Title Company and cancel the transaction if the revised Preliminary Report reveals material or substantial deviations from a previously provided Preliminary Report.

G. **CONDOMINIUM/PLANNED DEVELOPMENT DISCLOSURES (IF APPLICABLE):** This Agreement is, as specified in **paragraph 3L(7)**, contingent upon Buyer's review and approval of Common Interest Disclosures required by Civil Code § 4525 and under **paragraph 11M** ("CI Disclosures").

H. **BUYER REVIEW OF LEASED OR LIENED ITEMS CONTINGENCY (IF APPLICABLE):** Buyer's review of and ability and willingness to assume any lease, maintenance agreement or other ongoing financial obligation, or to accept the Property subject to any lien, disclosed pursuant to **paragraph 9B(6)**, is, as specified in **paragraph 3L(8)**, a contingency of this Agreement. Any assumption of the lease shall not require any financial obligation or contribution by Seller. Seller, after first Delivering a Notice to Buyer to Perform, may cancel this Agreement if Buyer, by the time specified in **paragraph 3L(8)**, refuses or is unable to enter into any necessary written agreements to accept responsibility for all obligations of Seller-disclosed leased or liened items.

I. **REMOVAL OR WAIVER OF CONTINGENCIES WITH OFFER: Buyer shall have no obligation to remove a contractual contingency unless Seller has provided all required documents, reports, disclosures, and information pertaining to that contingency.** If Buyer does remove a contingency without first receiving all required information from Seller, Buyer is relinquishing any contractual rights that apply to that contingency. **If Buyer removes or waives any contingencies without an adequate understanding of the Property's condition or Buyer's ability to purchase, Buyer is acting against the advice of Agent.**

J. **REMOVAL OF CONTINGENCY OR CANCELLATION:**

(1) **For any contingency specified in paragraph 3L, 8, or elsewhere, Buyer shall, within the applicable period specified, remove the contingency or cancel this Agreement.**

(2) For the contingencies for review of Seller Documents, Preliminary Report, and Condominium/Planned Development Disclosures, Buyer shall, within the time specified in **paragraph 3L** or **5 Days** after Delivery of Seller Documents or CI Disclosures, whichever occurs later, remove the applicable contingency in writing or cancel this Agreement.

(3) If Buyer does not remove a contingency within the time specified, Seller, after first giving Buyer a Notice to Buyer to Perform (C.A.R. Form NBP), shall have the right to cancel this Agreement.

K. **SALE OF BUYER'S PROPERTY:** This Agreement and Buyer's ability to obtain financing are NOT contingent upon the sale of any property owned by Buyer unless the Sale of Buyer's Property (C.A.R. Form COP) is checked as a contingency of this Agreement in **paragraph 3L(9)**.

9. **ITEMS INCLUDED IN AND EXCLUDED FROM SALE:**

A. **NOTE TO BUYER AND SELLER:** Items listed as included or excluded in the Multiple Listing Service (MLS), flyers, marketing materials, or disclosures are NOT included in the purchase price or excluded from the sale unless specified in this paragraph or **paragraph 3P** or as Otherwise Agreed. Any items included herein are components of the home and are not intended to affect the price. All items are transferred without Seller warranty.

B. **ITEMS INCLUDED IN SALE:**

(1) All EXISTING fixtures and fittings that are attached to the Property;

(2) EXISTING electrical, mechanical, lighting, plumbing and heating fixtures, ceiling fans, fireplace inserts, gas logs and grates, solar power systems, built-in appliances and appliances for which special openings or encasements have been made (whether or not checked in **paragraph 3P**), window and door screens, awnings, shutters, window coverings (which includes blinds, curtains, drapery, shutters or any other materials that cover any portion of the window) and any associated hardware and rods, attached floor coverings, television antennas, satellite dishes, air coolers/conditioners, pool/spa equipment (including, but not limited to, any cleaning equipment such as motorized/automatic pool cleaners, pool heaters, pool nets, pool covers, pool fencing), garage door openers/remote controls, mailbox, in-ground landscaping, water features and fountains, water softeners, water purifiers, light bulbs (including smart bulbs) and all items specified as included in **paragraph 3P, if currently existing at the time of Acceptance.**

**Note:** If Seller does not intend to include any item specified as being included above because it is not owned by Seller, whether placed on the Property by Agent, stager or other third party, the item should be listed as being excluded in **paragraph 3P(2)** or excluded by Seller in a counter offer.

(3) Security System includes any devices, hardware, software, or control units used to monitor and secure the Property, including but not limited to, any motion detectors, door or window alarms, and any other equipment utilized for such purpose. If checked in **paragraph 3P**, all such items are included in the sale, whether hard wired or not.

(4) Home Automation (Smart Home Features) includes any electronic devices and features including, but not limited to, thermostat controls, kitchen appliances not otherwise excluded, and lighting systems, that are connected (hard wired or wirelessly) to a control unit, computer, tablet, phone, or other "smart" device. Any Smart Home devices and features that are physically affixed to the real property, and also existing light bulbs, are included in the sale. Buyer is advised to use **paragraph 3P(1)** or an addendum to address more directly specific items to be included. Seller is advised to use a counter offer to address more directly any items to be excluded.

(5) Non-Dedicated Devices: If checked in **paragraph 3P**, all smart home and security system control devices are included in the sale, except for any non-dedicated personal computer, tablet, or phone used to control such features. Buyer acknowledges that a separate device and access to wifi or Internet may be required to operate some smart home features and Buyer may have to obtain such device after Close Of Escrow. Seller shall de-list any devices from any personal accounts and shall cooperate with any transfer of services to Buyer. Buyer is advised to change all passwords and ensure the security of any smart home features.